UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA

    -against-

GABRIEL GUILLEN, EDWARD JIMENEZ,
ZORAIDA RAMIREZ, WILSON GUILLEN,
JOEL TAPIA, MATTHEW VASQUEZ,
YEISON SALDANA, JASON LLANES,
GABRIEL CARRION, MOISES SUERO,
RICHARD JOSE, JHOAN PICHARDO,
RAFAEL RODRIGUEZ, and CARLOS
PEREZ,

                            Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _11/7/18_

17-CR-512 (KMW)

**AMENDED
OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Defendants Gabriel Guillen, Wilson Guillen, Edward Jimenez, Joel Tapia, Jason Llanes,

Yeison Saldana, Matthew Vasquez, and Gabriel Carrion (together, the "Moving Defendants")

have filed several pretrial motions.    For the reasons that follow, the motions are denied in their

entirety.    The Moving Defendants' arguments and motions overlap, and where sensible, the

Court has grouped them together.    Specifically:

1. The Court denies all motions to suppress evidence obtained as a result of any search

   warrant, arrest warrant, or wiretap order issued based upon information provided by

   the confidential source ("CS-1").    The Court also denies the motions for a hearing

   pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

2. The Court denies the motion to dismiss the Superseding Indictment.

3. The Court denies the motions (i) for disclosure of the grand jury minutes for the

   superseding indictment and (ii) for *in camera* review of the grand jury minutes.

4. The court denies the motion to suppress evidence obtained from the May 2017

wiretap of Vasquez's phone.

5.  The Court denies the motion to suppress evidence seized from a car driven by Wilson
    Guillen in Ohio in January 2017.

6.  The Court denies the motions to suppress evidence obtained from the June 16, 2017
    and August 16, 2017 cell site and geolocation information orders pertaining to, among
    others, Llanes; and the October 28, 2016, and August 11, 2017 cell site and
    geolocation information orders pertaining to, among others, Gabriel Guillen.

7.  The Court denies the motion to order the Government to provide the Moving
    Defendants certain pretrial disclosures, including a bill of particulars and early
    disclosure of Rule 404(b) evidence sixty days before trial.

## BACKGROUND

### I.  Case Overview

In 2016, the Drug Enforcement Administration ("DEA") began investigating an alleged

drug trafficking organization ("DTO") run by Gabriel Guillen and his associates, believed by the

Government to be distributing large quantities of heroin, crack cocaine, and powder cocaine in

New York, New Jersey, and Connecticut.[1]  The individuals under investigation included Gabriel

Guillen and his codefendants in this case: Edward Jimenez, Zoraida Ramirez, Wilson Guillen,

Joel Tapia, Matthew Vasquez, Yeison Saldana, Jason Llanes, Gabriel Carrion, Moises Suero,

Richard Jose, Jhoan Pichardo, Rafael Rodriguez, and Carlos Perez (together, the "Defendants").

Throughout the investigation, the DEA relied on CS-1, who worked closely with and

lived with the Defendants.  According to the Government, information provided by CS-1 was

---

[1]  The facts in this Section are drawn from both parties' briefs and, unless otherwise noted, are not in dispute.

2

corroborated by, among other things, intercepted phone calls, recorded conversations, surveillance photographs, firearms, and documentary evidence, as well as seizures of proceeds, narcotics, narcotics packaging. (Gov't's Mem. Law Opp'n Defs.' Pretrial Mots. ("Gov't Mem.") 8, ECF No. 253.) On August 17, 2017, while the DEA's investigation was ongoing, a grand jury returned a two-count indictment (the "Indictment") charging the Defendants with conspiring to distribute and possess with intent to distribute at least one or more kilograms of heroin, five or more kilograms of cocaine, and 280 grams and more of cocaine base, in violation of 21 U.S.C. § 846, and using and possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Subsequently, CS-1's credibility was called into question. Sometime in August 2017, after the grand jury returned the Indictment, CS-1 was kidnapped and seriously beaten. During its investigation into CS-1's kidnapping, the Government uncovered credible evidence which contradicted CS-1's account of the circumstances surrounding the kidnapping. Specifically, there was evidence that CS-1 was kidnapped in retaliation for CS-1's own theft of narcotics—allegedly stolen from the DTO for CS-1's personal gain—and that CS-1 may have purposefully identified individuals not present at the assault and kidnapping as having been involved. These revelations damaged CS-1's credibility, and the Government sought to determine whether information previously provided by CS-1 suffered from similar defects. In ensuing meetings with CS-1 and CS-1's counsel, the Government learned that CS-1 exaggerated the quantity of drugs allegedly trafficked by the DTO and the amount of money involved in the DTO's operations, personally used narcotics and engaged in the sale of narcotics while cooperating with the government (separate from the work CS-1 was authorized to perform under the DEA's supervision), lied about various events, stole drugs and/or money from members of the DTO, and falsified text messages to make it appear as if Gabriel Guillen had confessed to a murder.

(Cardi Decl., Ex. D, at 5–6 ("CS-1 Letters"), ECF No. 238.) CS-1 also lied about the participation of Vasquez and another individual in his kidnapping; it turned out neither individual had been involved.

Throughout its probe into CS-1's credibility, the Government submitted *ex parte* letters to the Court apprising the Court of the status of the inquiry (the "CS-1 Letters"). The Government disclosed these letters to Defendants on February 8, 2018, and subsequently produced further information regarding CS-1 to Defendants in May and April 2018. The May and June 2018 productions included the Government's notes of proffers with CS-1, DEA reports of meetings with CS-1, extraction reports for CS-1's phone, CS-1's criminal history, and portions of the original grand jury presentation. (Gov't Mem., Ex. D, at 2–3.)

Given CS-1's credibility issues, the Government elected to present a superseding indictment to a new grand jury. The Government states that it did not present information from CS-1 to the new grand jury, and relied only on other evidence. (Gov't Mem. 18; *id.*, Ex. C, at 2.) Defendants dispute this contention. (*See* Llanes Mem. 7.)

On April 11, 2018, a grand jury returned the Superseding Indictment, charging the defendants with the same first count, the narcotics conspiracy, in violation of 21 U.S.C. § 846, and charging only Tapia and Jimenez with the firearms count, in violation of 18 U.S.C. § 924(c).

To date, Moises Suero, Carlos Perez, and Zoraida Ramirez have pleaded guilty. The other Defendants have entered pleas of not guilty.

## II.    The Challenged Orders

### A.    Title III Wiretap Orders

During the Investigation, the Government intercepted and recorded various cell phone communications of Gabriel Guillen, Jimenez, Vasquez, Jose, Perez, and Carrion. These interceptions were authorized by four orders (the "Wiretap Orders") issued pursuant to the

4

Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522 ("Title III"), by judges of this district. Each of the Wiretap Orders required the Government to provide the Court with progress reports describing the need for continued interception approximately every ten days. The Government complied with this periodic report requirement.

Specifically:

- On February 17, 2017, Judge Engelmayer authorized the wiretap of a phone belonging to Gabriel Guillen, for a period of thirty days (the "February 17 Order"). Interception pursuant to the February 17 Order began on or about February 17, 2017, and terminated on or about March 18, 2017. The periodic reports were signed by Judge Swain and Judge Cote.

- On May 22, 2017, Judge Preska authorized the interception of wiretap of four cellular telephones believed to be used by Gabriel Guillen, Jimenez, Vasquez, and Jose, for a period of thirty days (the "May 22 Order"). Interception pursuant to the May 22 Order began on or about May 24, 2017, and terminated on or about June 22, 2017. The periodic reports were signed by Judge Ramos and Judge Batts.

- On June 15, 2017, Judge Batts authorized the wiretap of two phones believed to be used by Jimenez and Perez, for a period of thirty days (the "June 15 Order". Interception pursuant to the June 15 Order began on or about June 16, 2017, and terminated on or about July 15, 2017. The periodic reports were signed by Judge Castel.

- On August 16, 2017, Judge Caproni authorized the wiretap of two phones believed to be used by Gabriel Guillen and Carrion, for a period of thirty days (the

"August 16 Order". Interception pursuant to the August 16 Order began on or about August 16, 2017, and terminated on or about August 26, 2017. Given the short duration of the wiretap, no periodic reports were made.

On October 12, 2018, Vasquez filed an affidavit stating that his voice was captured on interceptions made pursuant to the May 22, 2017 Order. (ECF No. 329, Ex. 1.) On October 8, 2018, Gabriel Guillen filed an affidavit stating that his voice was captured on the Government's Title III wiretaps. (ECF No. 235, Ex. A.)

## B. Warrants and Orders for Prospective Cell Site Location Information, Pen Register Data, and Historical Location Information

### 1. June 2017 and August 2017 Llanes Applications

On June 16, 2017, the Government obtained an order for prospective and historical cell site location information and pen register information for two cellular phones (the "June 2017 Llanes Application"). Llanes was identified as the subscriber of one of the phones targeted by the order, and was believed to be a user of the other phone. (June 2017 Llanes Application 9– 10.)[2] The June 2017 Llanes Application authorized the government to prospectively collect precision location information for a period of forty-five days, access historical cell site data from the prior six days (i.e., June 10, 2017, to June 16, 2017), and access routing, addressing, or signaling information associated with each call transmitted to or from the target phones for 60 days from the date of the order.

On August 16, 2017, the Government obtained a similar order granting it access to prospective and historical CSLI and pen register information (the "August 2017 Llanes Application"). The August 2017 Llanes Application targeted fourteen different cell phones.

---

[2] In citations to the Llanes Applications, the Court uses the ECF pagination.

6

Gabriel Guillen, Jimenez, Llanes, Saldana and Tapia, among others, were listed as targets. (Aug. Llanes App. 10–13.)

On October 17, 2018, Llanes filed a sworn affidavit stating that he owns one of the cell phones targeted in the June Llanes 2017 Application and one of the phones targeted in the August 2017 Llanes Application.    (Aff. Jason Llanes, ECF No. 250.)

## 2.    October 2016 Guillen Order

On October 28, 2016, the Government obtained an order for historical cell site location information for ten cellular phones (the "October 2016 Guillen Order"), that was issued pursuant to 18 U.S.C. § 2703(d).[3]    Gabriel Guillen, Vasquez, and Tapia (among others) were identified as users of the phones targeted by the order.    The order authorized the government to access historical cell site data for the period from August 1, 2016, to the date of the order.    Magistrate Judge Fox reviewed and signed the order.

## 3.    August 2017 Guillen Order

On August 11, 2017, the Government obtained a warrant and order granting it access to prospective and historical cell site location information and pen register information for two phones (the "August 2017 Guillen Order"), the subscribers to which were unknown at the time. The order authorized the government to access historical cell site data for the period from July 15, 2017 through the date of the order, prospective location information for a period of forty-five days from the date of the order, and pen register information for a period of sixty days from the date of the order.    Magistrate Judge Ellis reviewed and signed the order, finding there was probable cause that the prospective and historical location information would reveal evidence of

---

[3] Although this order also targeted other Defendants, the Court refers to it as the October 2016 Guillen Order because Guillen filed the motion to suppress evidence obtained based on this Order.

crimes.

## III. The Motions

On September 7, 2018, Tapia and Jimenez filed a motion seeking (1) suppression of evidence obtained as a result of any search warrant, arrest warrant, or wiretap order that was based on information provided by CS-1 (the "Challenged Orders"), or in the alternative, a *Franks* hearing to determine the admissibility of such evidence, and (2) dismissal of the Superseding Indictment.[4] (Mem. Law Supp. Defs.' Mot. Suppress Evid. and Mot. Dismiss Indictment ("Tapia Jimenez Mem.") 2.) Tapia and Jimenez also requested to join in all motions submitted by Llanes and their other co-defendants.

Also on September 7, 2018, Vasquez filed a motion seeking to suppress the evidence obtained pursuant to the Government's wiretap of his cell phone. (Mem. Law. Supp. Def. Matthew Vasquez's Pretrial Mots. ("Vasquez Mem."), ECF No. 219.)

On October 12, 2018, Llanes filed a motion seeking: (1) disclosure of the grand jury minutes, or in the alternative, *in camera* review of the grand jury minutes by the Court; (2) government production of a bill of particulars; (3) suppression of prospective telephone location information and historical cell site location information; (4) early disclosure of Rule 404(b) evidence; and (5) permission to make additional motions and to join in co-defendants' motions. (Def. Jason Llanes' Pre-Trial Mots. ("Llanes Mem."), ECF No. 237.)

Gabriel Guillen and Wilson Guillen joined in all of Llanes's motions. (ECF Nos. 213, 216.) As noted above, Tapia and Jimenez also joined Llanes's motions. Saldana and Carrion joined in Llanes's wiretap suppression motion. (ECF Nos. 211, 212, 236.)

---

[4] Tapia and Jimenez requested to file this motion under seal. They are directed to meet and confer with the Government to create a redacted version for public filing.

8

Wilson Guillen additionally moved for the suppression of evidence seized in relation to an automobile stop in Ohio on January 10, 2017. (ECF No. 216.)

On October 3, 2018, the Government filed its reply. (ECF No. 253.) In response to the Government's argument that several of the Moving Defendants failed to allege their standing to contest the Challenged Orders, Gabriel Guillen and Saldana filed letters with the Court attempting to rectify that alleged defect. (ECF Nos. 235, 236.)

On October 19, 2018, the Government filed a sur-reply. (Gov't's Sur-Reply Opp'n Defs.' Pretrial Mots. ("Gov't Sur-Reply"), ECF No. 253.)

## DISCUSSION

### I. Evidence Obtained from Applications that Referenced CS-1's Statements

Several Moving Defendants move for the suppression of evidence obtained as a result of orders issued based on information provided by CS-1. Tapia and Jimenez's request is the broadest: They move to suppress all evidence obtained as a result of any search warrant, arrest warrant, or Title III order that was based upon information provided by CS-1. (Tapia Jimenez Mem. 3–9.) In the alternative, they seek a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Several other motions now before the Court fall under the umbrella of Tapia and Jimenez's motion, and rely on the same arguments. Specifically, Vasquez seeks suppression of evidence obtained from the wiretap of his phone, arguing that without information derived from CS-1, it lacks probable cause. (Vasquez Mem. 5.) In addition, Wilson Guillen seeks suppression of evidence recovered from his traffic stop on January 10, 2017, arguing that the evidence seized was the fruit of a GPS tracking warrant that relied on CS-1's statements (and was

therefore illegally obtained.[5]  (Wilson Guillen's Pre-Trial Mots. ("Wilson Guillen Mem.") 5–6, ECF No. 216.)

The Moving Defendants all rely on the same argument for suppression—namely, that the Government exhibited a reckless disregard for the truth when it included CS-1's statements in warrant affidavits and applications for wiretaps pursuant to Title III applications.  The Government contends initially that the Moving Defendants, with the exception of Llanes, have not demonstrated their standing to challenge the introduction of evidence obtained as a result of the Challenged Orders.  The Government then argues that, in any event, Defendants cannot make the showing necessary for a *Franks* hearing, because the Government did not act with reckless disregard for the truth when it made its applications for the Challenged Orders.

Because the Court holds, for reasons discussed below, that CS-1's credibility issues do not provide a basis for suppression of the evidence obtained based on the Challenged Orders, the Court need not determine to what extent the Moving Defendants have standing to challenge the orders.[6]

## A.  Legal Standard

Under *Franks v. Delaware*, 438 U.S. 154, 164 (1978), in certain limited circumstances a criminal defendant is permitted to challenge a warrant by attacking the veracity of the warrant's underlying affidavit.  "To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's

---

[5]  Wilson Guillen also seeks suppression on the ground that the stop was pretextual.  (Guillen Mem. 7–8.) That argument is addressed below, in Section VI.

[6]  In the Fourth Amendment context, "standing" is "shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search."  *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).  "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."  *Id.*

10

deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998); *see also Franks*, 438 U.S. at 155–56. Here, the Moving Defendants challenge the veracity of the affidavits supporting the Challenged Orders on the ground that CS-1 turned out to have falsified information, which the Government relied on its applications for the orders. For purposes of this motion, the Court assumes that CS-1's statements were material, and that the Challenged Orders would not have been signed had CS-1's statements been omitted, satisfying *Franks*'s second prong. Therefore, the only issue before the Court with respect to this motion is whether the Moving Defendants have made a "substantial preliminary showing" that the Government acted intentionally or with reckless disregard for the truth when it included CS-1's statements in its applications for the challenged orders.

Determining whether the affiant deliberately falsified information or acted with reckless disregard for the truth requires consideration of the affiant's "actual state[] of mind." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013); *Franks*, 438 U.S. at 171 ("[T]he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."). The burden is on the defendant to present the reviewing court with "credible and probative evidence" that the information in an application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (discussing the omission of information); *see also Franks*, 438 U.S. at 171 (stating that "the allegations of deliberate falsehood or of reckless disregard for the truth . . . must be accompanied by an offer of proof").

Moreover, "reckless disregard for the truth" entails more than mere negligence on the part of the affiant." *Franks*, 438 U.S. at 171. Courts in this district have defined "reckless disregard" as requiring that the affiant entertained "serious doubts" about the truth of his

11

statements. *See, e.g., United States v. Mandell*, 710 F. Supp. 2d 368, 373–74 (S.D.N.Y. 2010) (Crotty, J.); *United States v. Vilar*, No. S305 CR 621 (KMK), 2007 WL 1075041, at \*26 (S.D.N.Y. Apr. 4, 2007) (Karas, J.); *United States v. Goldenberg*, No. 05 CR. 1034 (DC), 2006 WL 266564, at \*4 (S.D.N.Y. Feb. 3, 2006) (Chin, J.).

## B. Application

The Moving Defendants' attack on the Challenged Orders fails because they have not provided any "credible and probative evidence" that the Government recklessly disregarded the truth in applying for the Challenged Orders. *Rajaratnam*, 719 F.3d 139, 154. To the contrary, the record indicates that the Government made significant, successful efforts to corroborate CS-1's statements. Throughout the investigation of the DTO, CS-1's statements were corroborated by conversations intercepted pursuant to the Wiretap Orders, evidence obtained during arrests, and physical surveillance by government agents. Far from demonstrating reckless disregard for the truth, the evidence gathered throughout the investigation supported the Government's belief that CS-1 was credible.

Calls overheard on the wiretaps supported the Government's belief that the Moving Defendants were engaged in the sale of illegal narcotics. For example, in one intercepted call, Jimenez asked CS-1 if something was "pure," and CS-1 responded, "Pure! That shit is official. Then again, this one is kind of different because it's like fluffier. You can't break it down correctly, it turns into little rocks." (Gov't Mem., Ex. H, at 22.) Gabriel Guillen also discussed with defendant Rivera how defendant Perez was looking for the "hard ones" as well as the soft ones," and that the "soft ones" were available, but Perez would have to wait for the "hard." (*Id.* at 20). In addition to this example, several other explicit conversations conducted over the wire corroborated what the agents were hearing from CS-1, that are documented in the sworn affidavits supporting the Government's wiretap applications. (*See* Gov't Mem, Ex. H;

12

Gov't Mem, Ex. I.)

Furthermore, CS-1's predictions were confirmed by ensuing events. On January 9, 2017, CS-1 informed Government agents that Wilson Guillen would be travelling to Chicago soon in a DTO van to buy drugs, and that he would be carrying approximately $400,000 in cash. (Gov't Mem., Ex. I, at 18.) On January 10, 2017, Wilson Guillen was stopped in Ohio, where officers found $56,000 in a hidden compartment in the Van. Although this amount was smaller than the amount predicted by CS-1, it corroborated CS-1's statement that Wilson Guillen would be driving to Chicago with DTO money.

CS-1's information was also corroborated by physical surveillance conducted by the agents. For example, on October 19, 2016, agents sent CS-1 into Gabriel Guillen's apartment with a recording device. CS-1 left some time later with Gabriel Guillen and Ramirez in a van. While CS-1 and Guillen were driving, Guillen discarded a bag from the van, which agents recovered. The bag contained what appeared to be drug packaging with the label "PANTERA" on it, which CS-1 had informed the agents was one of the brands of drugs that the DTO was selling at that time. (Gov't Mem., Ex. I, at 14-15). Residue on the packaging tested positive for cocaine, and fingerprint analysis showed that Gabriel Guillen's fingerprints were on the bag.

Defendants argue the failure of Government agents to realize CS-1 was using narcotics during the investigation and engaging in activity other than what the agents had authorized demonstrates the agents' reckless disregard for the truth. (Tapia Jimenez Mem. 6.) This allegation at most suggests negligence on the part of the agents; it does not constitute a "substantial preliminary showing" that an agent entertained "serious doubt" about any of his or her statements in the applications supporting the Challenged Orders. Tapia and Jimenez's other allegation is that the Government's disclosure of information related to CS-1 has been "piecemeal and incomplete," hindering their ability to gauge the extent of the informant's

13

untruthfulness. This allegation is belied by the Government's prompt and consistent disclosure of CS-1 materials to the Defendants. In any event, this assertion fails to show that the Government demonstrated a reckless disregard for the truth in its applications for the Challenged Orders.

The Government's efforts, coupled with the corroboration of CS-1's statements, support the finding that the Government acted in good faith and with due care. Defendants do not point to any evidence that calls this finding into question. Therefore, because the Moving Defendants have not made a "substantial preliminary showing" that the Government acted with a reckless disregard for the truth, the motion to suppress the evidence obtained from the Challenged Orders is DENIED without the need for a *Franks* hearing.

## II.   Disclosure of Grand Jury Minutes

Llanes has moved pursuant to Fed. R. Crim. P. 6(e) for disclosure of the grand jury minutes, or in the alternative for the Court review the grand jury minutes *in camera*, due to his concern that the Government may have presented information from CS-1 to the grand jury.[7] (Llanes Mem. 6–8.)   Because Llanes has not made a showing of particularized need, this motion is denied.

### A.   Relevant Facts

When the Government presented evidence to the grand jury that returned the initial August 2017 indictment, it had not yet become aware of CS-1's credibility issues. (Gov't Mem, Ex. C, at 2.)   Upon learning of CS-1's credibility problem, the Government advised the defendants that it intended to empanel a new grand jury and request a superseding indictment

---

[7] Gabriel and Wilson Guillen join in this motion, relying on Llanes's arguments. For simplicity, the Court refers to Llanes in this portion of the opinion, but its rulings apply equally to Gabriel and Wilson Guillen.

14

from this new grand jury. (*See id.*) The Government further advised that it would not present information from CS-1, "but [would] instead rely on the abundance of other evidence in this case." (*Id.*)

The Government then empaneled a new grand jury, which returned the Superseding Indictment on April 11, 2018. The Government states that it did not present any information obtained from CS-1 to the new grand jury, with the exception of transcripts from several recordings that CS-1 made during conversations with DTO members.

## B. Applicable Law

A defendant seeking disclosure of grand jury minutes must demonstrate a "particularized need" for the disclosure which outweighs the Government's interest in maintaining the secrecy of the grand jury proceeding. *Dennis v. United States*, 384 U.S. 855, 871–72 (1966); *see also In re Fed. Grand Jury Proceedings*, 760 F.2d 436, 439 (2d Cir. 1985) (describing the test for particularized need as "strict"). The burden is on the defendant to show that "the material [he] seek[s] is needed to avoid a possible injustice . . . , that the need for disclosure is greater than the need for continued secrecy, and that [his] request is structured to cover only material so needed." *In re Fed. Grand Jury*, 760 F.2d at 439 (quoting *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979)).

Moreover, "grand jury proceedings carry a 'presumption of regularity.'" *United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990), *abrogated on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir.2010) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n. 23 (1974)). Accordingly, "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *Id.*

## C. Discussion

Llanes concedes that he does not allege government misconduct during the grand jury

15

proceedings, but nonetheless argues that he should be able to review the grand jury minutes in order to ensure CS-1 did not testify. (Llanes Mem. 7.) Essentially, Llanes questions the credibility of the Government's assertion that it did not rely on information from CS-1 in obtaining the Superseding Indictment.

Llanes's bare allegation that the Government's account of the grand jury proceeding is not credible fails to defeat the presumption of regularity accorded to such a proceeding. The Government states that in obtaining the Superseding Indictment, it did not rely on testimony from CS-1, and the Court finds the Government's contention credible given the existence of ample record evidence corroborating many of CS-1's statements. Therefore, because the Moving Defendants have not made any showing of a particularized need, or made any concrete allegations of Government misconduct, their request is denied in its entirety. *See, e.g., United States v. Goff,* No. 15 Cr. 616 (KBF), 2016 WL 3264129, at \*4 (S.D.N.Y. June 13, 2016) (Forrest, J.) (denying a motion for disclosure of grand jury minutes, or for *in camera* review, because the defendant "failed to present any concrete support for the contention that there were irregularities before the grand jury"); *United States v. King,* No. 10 CR. 122 (JGK), 2011 WL 1630676, at \*5 (S.D.N.Y. Apr. 27, 2011) (Koeltl, J.) (denying defendant's request for *in camera* review or early release of transcripts because he did not demonstrate "particularized need"); *United States v. Scott,* 624 F. Supp. 2d 279, 291 (S.D.N.Y. 2008) (Baer, J.) (same).

## III. The Superseding Indictment

Tapia and Jimenez move to dismiss the Superseding Indictment on the grounds that (1) the Government presented statements from CS-1 to the grand jury that have since been revealed to be false; and (2) the Government presented illegally seized evidence to the grand jury. (Tapia Jimenez Mem. 9–10). For the reasons discussed above in Section II, these arguments are meritless. The motion is therefore DENIED.

16

## IV. Authorization of and Review of the Wiretap Orders by Different Judges

Saldana moves to suppress all evidence obtained through the Title III interceptions, arguing that the Government should have presented all of its Title III applications and periodic reports to the same judge. (Mem. Law Supp. Def. Yeison Saldana's Mot. Suppress ("Saldana Mem.") 7–8, ECF No. 211, Ex. 1.) Saldana contends that, had the same judge reviewed each wiretap application, he or she would have found that CS-1 had successfully infiltrated the DTO, and consequently would have denied the wiretap application as unnecessary. (*Id.* at 9.) Along similar lines, Saldana argues that, had the same judge who authorized a particular wiretap reviewed the periodic progress reports for that wiretap, he or she would have discontinued the wiretap on the ground it was unnecessary. These arguments are meritless.

Nothing in Title III mandates that progress reports be submitted to the same judge who authorized the wiretap, let alone be made at all. *United States v. Love*, 859 F. Supp. 725, 731–32 (S.D.N.Y. 1994), *aff'd sub nom. United States v. Roberts*, 100 F.3d 942 (2d Cir. 1996) (rejecting the argument that reports must be made to the same judge who issued the wiretap); *see also United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir. 1977) ("The requirement of reports . . . is . . . discretionary with the judge authorizing the [wiretap]."). Rather, when an order authorizing interception is entered pursuant to Title III, "the order *may* require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge *may* require." 18 U.S.C. § 2518(6) (emphasis added). Therefore, there is no basis for Saldana's argument regarding the submission of the periodic progress reports to the authorizing judge.

Furthermore, this district's standard practices are for wiretap applications and periodic reporting on wiretaps (assuming they are required by the order authorizing the wiretap) to be

17

presented to the Part 1 Judge. Saldana fails to cite any authority for the proposition that the Government must present subsequent wiretap applications for new phone numbers to the same judge who authorized prior wiretaps simply because the wiretaps are part of the same investigation. The Government properly submitted its periodic reports and requests for new Title III interceptions in this case to the judge who was assigned to Part 1 at the time. Each authorizing judge directed the Government to present the periodic reports to the judge on Part 1 duty, and the Government did so. The decisions Saldana cites in which the Government completely failed to provide periodic reports are therefore inapposite.

Because Saldana's motion is meritless, it is DENIED.

## V. Necessity of May 22 Wiretap Order

Vasquez argues that all evidence obtained from the Government's wiretap of his phone pursuant to the May 22 Order should be suppressed because the Government failed to show that such a wiretap was necessary. (Vasquez Mem. 7.)

### A. Applicable Law

The review of a district judge's decision to authorize a wiretap is "circumscribed, extending only so far as to 'ensur[e] [ ] that the facts set forth in the application were minimally adequate to support the determination that was made.'" *United States v. Kirk Tang Yuk*, 885 F.3d 57, 77 (2d Cir. 2018), *cert. denied sub nom. Thomas v. United States*, No. 18-237, 2018 WL 4031248 (U.S. Oct. 9, 2018) (quoting *United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (alterations in *Kirk Tang Yuk*)). Accordingly, in ruling on a motion to suppress wiretap evidence, the findings of the court that issued the wiretap are entitled to "considerable deference." *Concepcion*, 579 F.3d at 217 (reversing reviewing judge's suppression order).

Title III sets out the minimum requirements for obtaining judicial authorization to intercept wire, oral, or electronic communications. *See* 18 U.S.C. §§ 2510–2522. As relevant

18

here, Title III requires a wiretap applicant to provide, upon oath or affirmation, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c); *see also United States v. Lambus*, 897 F.3d 368, 394 (2d Cir. 2018). The judge reviewing a wiretap application must determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(3)(c).

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). However, "the purpose of . . . § 2518 is not to preclude the Government's resort to wiretapping 'until after all other possible means of investigation have been exhausted by investigative agents.'" *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (quoting *Torres*, 901 F.2d at 230). Rather, the statute simply requires the government to "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 11 (quoting *Torres*, 901 F.2d at 230); *accord Concepcion*, 579 F.3d at 218 ("[T]he Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance."). Moreover, the question of whether a wiretap is necessary "must be tested in a practical and common sense manner." *Diaz*, 176 F.3d at 111. "A reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required." *United States v. Ianniello*, 621 F. Supp. 1455, 1465 (S.D.N.Y.) (Weinfeld, J.), *aff'd*, 808 F.2d 184 (2d Cir. 1985).

## B.  Discussion

A review of the May 22 Order demonstrates that Vasquez's argument is without merit.

The Government's application for the May 22 Order was accompanied by an affidavit from DEA Special Agent Joseph Mercurio.   The affidavit discusses in detail why various investigative techniques were not reasonably likely to enable law enforcement agents to fully understand the scope, membership, and activities of the DTO.   (*See* Gov't Mem., Ex. G, at 37–46.)   Mercurio explained, for example, that the members of the DTO did not fully trust CS-1, and it was therefore unlikely that an undercover officer introduced by CS-1 would be successful.   In addition, according to Mercurio, the DTO did not engage in drug sales in public areas, so physical surveillance would not be effective.   Mercurio also provided examples of investigative techniques that were employed by agents, but which failed to achieve the goals of the investigation.   He noted, for example, that GPS trackers used to surveil the movements of the DTO's members provided some insight into the means and methods used by DTO members, but could not reveal the full extent of the DTO's operations.   In all, thirteen potential techniques were discussed.

In sum, the affidavit supporting the May 22 order gave reasoned explanations, consistent with common sense, as to why a wiretap was necessary to achieve the investigation's goals. Accordingly, the Court DENIES Vasquez's motion to suppress the wiretap evidence.[8]

## VI.   Stop and Search of Wilson Guillen's Vehicle

Wilson Guillen moves to suppress evidence seized from the January 10, 2017 stop of a vehicle he was driving on the ground that there was not probable cause for the stop or for the

---

[8] Vasquez also contends that there was not probable cause to issue May 22 Order.   Title III requires a wiretap applicant to provide, upon oath or affirmation, "'full and complete statement[s]' both as to probable cause for the requested interceptions and as to the need to use such methods.   *Lambus*, 897 F.3d at 394 (quoting § 2518(1)(b) and (c)).   Vasquez's argument does not allege that probable cause was lacking on the face of the wiretap application; rather, he attacks the credibility of the information Mercurio relied on in his affidavit. That argument fails for the reasons stated above in Section I.

subsequent search.  (Wilson Guillen Mem. 7–8.)

## A.    Relevant Facts

On or about January 9, 2017, CS-1 informed agents that Wilson Guillen would be driving a large amount of money to Chicago for the DTO.   (Wilson Guillen Mem., Ex. C, at 1.)   CS-1 stated that the money would be in a hidden compartment within the van that Wilson Guillen would be driving.   Relying on this information, agents contacted an Ohio State Trooper (the "Trooper") and asked for assistance in conducting surveillance and a possible vehicle stop.   (*Id.*) At the time, the agents had a GPS monitoring device on the van, pursuant to a warrant.   (*Id.*, Ex. A.)

On January 10, 2017, the Trooper pulled over the van.   In the report authored by the Trooper after the stop, the Trooper explained that prior to the stop, he was stationed on a highway crossover observing traffic.   (*Id.*, Ex. E, at 1.)   After seeing the vehicle pass by, he exited the crossover to observe it more closely, and his own vehicle began to lose traction.   (*Id.*) According to the Trooper, it had been raining periodically throughout the night, and he believed the roads were freezing over.   (*Id.*)   When he caught the van, "it was the lead vehicle in a group of several other vehicles, which included several semi-tractor trailers."   (*Id.*)   The Trooper explained:

> The van was in the center lane and traveling faster than the other
> vehicles in the group because it was pulling away from them.   I
> began pacing the van's speed at speeds between 64 and 68 miles per
> hour.    After seeing what the road conditions were like upon exiting
> the crossover, I felt that the speed that the van was traveling at were
> too fast for the current conditions of the road surface.   I decided to
> stop the van for its speed.

(*Id.*).   The Trooper pulled over the van and walked around the van with a drug-detecting dog, which indicated the possible presence of narcotics.   (*Id.* at 3).   The Trooper searched the van and found a hidden compartment in the van with three vacuum sealed packages containing

21

$56,000 in United States currency. (*Id.* at 3–4.)    Subsequently, a second dog "positively indicated" to the Currency. (*Id.* at 4.)

## B.    Applicable Law

"[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993) (alteration in original)). Accordingly, to justify a traffic stop, "the police must have either 'probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *United States v. Gaines*, 457 F.3d 238, 243 (2d Cir. 2006) (quoting *Scopo*, 19 F.3d at 781–82).    The Second Circuit has "unambiguously" held that even reasonable suspicion of an arguably minor traffic violation provides a sufficient basis for law enforcement officers to make a traffic stop.    *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) (holding that a stop of the driver of a livery cab based on officers' belief that the cab was unlawfully encroaching on a crosswalk complied with the Fourth Amendment).

Where an officer observes a traffic offense, he has probable cause to stop the driver of the vehicle.    *Scopo*, 19 F.3d at 782.    Moreover, once an officer has lawfully stopped a car, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," an officer may conduct "a search of any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820–821 (1982)).    Probable cause "does not demand certainty."    *United States v. Gaskin*, 364 F.3d at 456–57 (2d Cir. 2004).    Rather, there need only be "a fair probability that contraband or evidence of a crime will be found."    *Id.*    Accordingly, probable cause for a vehicle search exists where facts and circumstances known by the officer would lead a "reasonabl[y] cautious" person to believe that evidence of a crime will be found in the car.    *Id.* at 456 (quoting *Brinegar*

*v. United States*, 338 U.S. 160, 175 (1949)).

So long as the stop is supported by objective probable cause for a traffic violation, the officer's "[s]ubjective intentions" in stopping the vehicle "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). "In other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998). When evaluating the Fourth Amendment reasonableness of a stop, then, the court is foreclosed from inquiring into the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813.

## C. Discussion

Wilson Guillen's primary argument for suppression is that the reasons the Trooper provided in his report for stopping the van were pretextual. This argument is defeated by the Supreme Court's holding in *Whren*. The Court cannot inquire into a law enforcement agent's subjective motivations for making a stop; therefore, so long as the stop was supported by probable cause that Guillen was engaged in unlawful conduct—even an arguably minor traffic violation—the stop was valid under the Fourth Amendment. *Whren*, 517 U.S. at 813; *Dhinsa*, 171 F.3d at 724-25. Moreover, once the stop was initiated, the Trooper's search of the van was legal so long as it was supported by probable cause. *Gant*, 556 U.S. 332, 347. The Court thus turns to the issue of whether the stop and the subsequent search were supported by probable cause.

### 1. The Stop

Ohio law makes it unlawful to operate a car "at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions." Ohio Rev. Code 4511.21(A). In his report, the Trooper stated that based on

23

his observation of the road conditions, "the speed that the van was traveling at were [sic] too fast for the current conditions of the road surface." (Gov't Mem., Ex. E, at 1.) Based on a plain reading of the statute, together with the Trooper's report, there was probable cause that when Wilson Guillen was stopped, he was committing a traffic violation by driving too fast given the road conditions, in violation of Ohio law.[9]

This objective probable cause justified the stop, regardless of the Trooper's subjective intentions in stopping the van. *Whren*, 517 U.S. at 813-14; *see also United States v. Bayron David Figueroa*, 425 F. App'x 15, 17 (2d Cir. 2011) (holding that even if a state trooper elected to use a speeding violation as pretext for a stop which was in truth based on discussions with federal agents, suppression was not required). Wilson Guillen's contention that the Trooper failed to document his prior conversations with DEA agents in his incident report fails to render the stop unconstitutional.

### 2. The Search

Although Wilson Guillen does not specifically argue that the dog sniff unreasonably prolonged the stop, for the purposes of the motion, the Court assumes that it did, and that reasonable suspicion was therefore required for the dog sniff. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015) (holding that, absent additional reasonable suspicion, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures"). The following facts, taken from the Trooper's report and not disputed by Wilson Guillen, support the finding that reasonable suspicion of criminal activity existed during the stop: (1) there was an overwhelming odor of

---

[9] Although Wilson Guillen accuses the Trooper of being "dishonest[]" (Wilson Guillen Mem. 8), he does not dispute the officer's account of his driving, the road conditions. Nor does he offer any argument regarding Ohio traffic law.

24

deodorizer present; (2) there were numerous air fresheners in the vehicle; (3) Wilson Guillen stated he was going away for three days, but had no luggage; (4) Wilson Guillen said he was going to visit family, but did not know the name of the city; and (5) there was a spare tire laying in the cargo area, rather than in its proper location.[10] *See, e.g., United States v. Lopez*, 553 F. App'x 10, 12 (2d Cir. 2014) (affirming a district court's holding that there was reasonable suspicion of criminal activity based on (1) the presence of two cellular phones and an air freshener, (2) the officer's observation that the driver was shaking and breathing irregularly, and (3) the driver's difficulty answering questions about his travel plans). Accordingly, the dog sniff was lawful.

The dog gave a positive indication that there was an odor of narcotics coming from the vehicle. This, together with the facts cited above supporting reasonable suspicion, provided probable cause to justify a search of the van. *See Gant*, 556 U.S. at 347. Because the stop and search of the van were lawful, Wilson Guillen's motion to suppress the evidence seized from the Van is therefore DENIED.[11]

## VII. Orders Authorizing Cell Site Location Information

Llanes and Guillen move to suppress evidence obtained from various orders authorizing the government to access historical and prospective cell site location information. Llanes moves to suppress the evidence obtained pursuant to the June and August 2017 Llanes

---

[10] Again, although Wilson Guillen argues that the Trooper's failure to discuss the DEA tips in his report raise questions regarding the Trooper's credibility, he does not dispute the Trooper's account of his statements regarding his travel plans, the car's odor and the air fresheners, or the location of spare tire.

[11] Wilson Guillen also argues that evidence seized from the Van should be suppressed on the ground that the Van was located with the aid of a warrant authorizing agents to track the Van's movements; he contends that because probable cause for issuance of the warrant relied on statements from CS-1, the fruits of the warrant should be suppressed. (Wilson Guillen Mem. 1.) He alternatively requests a *Franks* hearing. For the reasons set forth in Section I, this argument is without merit.

Applications for cell site location and geolocation information. Guillen moves to suppress evidence obtained from the October 2016 Order and the August 2017 Order. Both Llanes and Guillen rest their argument for suppression on the ground that the applications lacked probable cause.[12] In addition, Llanes argues that the 2017 Llanes Applications failed to comply with the requirements of § 2703 of the Stored Communications Act, which requires the Government to offer "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought are relevant and material to an ongoing criminal investigation."

## A. Llanes Applications

### 1. Relevant Facts

The June 2017 Llanes Application sought historical and prospective location data for two phones believed to be used by Llanes. (Llanes Mem., Ex. B, at 10–11.)[13] The application was supported by an affidavit from New York City Police Department ("NYPD") Detective Jose Sandobal, who averred his experience investigating drug trafficking crimes and his familiarity with manners and methods of drug trafficking. Detective Sandobal explained that for almost a year, the NYPD and the DEA had been investigating a DTO run by Gabriel Guillen, of which Llanes was believed to be a member. (*Id.* at 11.) He then described an intercepted call from June 5, 2017, between Llanes and Vasquez (the latter also believed to be a DTO member). Sandobal's view, which was based on his participation in the investigation and his review of interceptions made pursuant to the May 22 Order, Llanes and Vasquez were discussing narcotics

---

[12] Guillen also argues that evidence obtained based on the October 2016 Order and the August 2017 Order should be suppressed because the government's applications for the orders relied on information obtained from CS-1. For the reasons described in Section I, this argument is without merit.

[13] In citations to the 2017 Llanes Applications, the Court uses the ECF pagination.

26

trafficking on the call. (*Id.* at 12.) Specifically, Sandobal stated that he believed Llanes requested Narcotics and that Llanes stated he was serious about the request. (*Id.* at 13.) The affidavit also stated that about a week later, on June 15, 2017, Vasquez reported a stolen car near Castle Hill and Chatterton Avenues in the Bronx. CS-1 reported to an agent that at a subsequent meeting at which Llanes and CS-1 were present, Vasquez stated that he planned to kill the individual he believed stole his car. Magistrate Judge Francis reviewed and signed the warrant and order based on the application.

The August 2017 Llanes Application sought data for phones belonging to multiple defendants, including one phone belonging to Llanes. (Llanes Mem., Ex. C, at 10.) It was supported by affidavit from DEA Officer John King. Similar to the June 2017 application, the August 2017 Llanes Application set forth detailed information about the DTO and its operations, in the form of information provided by CS-1 as well as corroboration obtained from surveillance, recovery of drug packaging material from Gabriel Guillen, multiple recorded conversations about drugs between DTO members, seizures of drugs and money from DTO members; and intercepted telephone calls between DTO members. (*Id.* at 15–20.) Agent King explained that Llanes was believed to be a member of the DTO and described a call between Llanes and Vasquez in which Vasquez pressed Llanes for money. (*Id.* at 15–20.) Based on Agent's King training and experience, involvement in the investigation, and communications with CS-1, King believed that Vasquez wanted money from Llanes for narcotics trafficking work that Vasquez had performed. (*Id.* at 13.) Magistrate Judge Moses reviewed and signed the warrant and order based on the application.

### 2. Discussion

Llanes argues that the June 5, 2017 call cannot establish probable cause for the June Llanes 2017 Application, because the call was about a car, not narcotics. (Llanes Mem. 10.)

Llanes make a similar argument with respect to the August 2017 Llanes Application. Llanes also argues that the application did not comply with the statutory requirements of the Stored Communications Act. (*Id.* at 12.) Even assuming, *arguendo*, that Llanes is correct, that does not provide a reason to suppress evidence obtained as a result of the warrant, because the evidence was seized "in objectively reasonable reliance on" a warrant issued by a detached and neutral magistrate judge. *United States v. Leon*, 468 U.S. 897, 922 (1984). Where this is the case, "the exclusionary rule barring illegally obtained evidence from the courtroom does not apply. . . even where the warrant is subsequently deemed invalid." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).

Llanes contends that the good-faith exception does not apply here because the warrants are so facially deficient that law enforcement officers' reliance upon them was unreasonable. (Def. Jason Llanes Reply Mem. ("Llanes Reply") 3, ECF No. 240.) Indeed, if an application "is so lacking in indicia of probable cause as to render reliance upon it unreasonable," the Government may not rely on the good-faith exception. *Falso*, 544 F.3d 110, 125; *see also id.* 125, n.24 (noting that "this is a very difficult threshold to meet"). In support of this argument, Llanes contends that the language in the recorded telephone calls relied on in the Llanes Applications was too ambiguous for Detective Sandobal and Agent King to have reasonably concluded that the DTO members were discussing narcotics trafficking, and therefore the good-faith exception does not apply.

The Court disagrees. "Although the conversations may have had an innocent meaning, it can hardly be said that the agents' interpretations were unreasonable or implausible." *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995). Therefore, even if an innocent explanation for the conversation existed, that would not undermine law enforcement officers' good-faith reliance on the warrant. *See United States v. Feola*, 651 F. Supp. 1068, 1096

(S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) (citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)); *accord Cancelmo*, 64 F.3d at 809. This is particularly true where, as here, the conversations "were not randomly intercepted," rather, they were part of an ongoing investigation of the DTO in which both affiants were participants. *See Cancelmo*, 64 F.3d at 808. Moreover, Sandobal's and King's affidavits supporting the Llanes Applications stated that they have extensive experience investigating drug trafficking generally, and familiarity with the investigation underlying this case in particular. (Llanes Mem., Ex. B, at 8–9; *id.*, Ex. C, at 8–10.) Given that the interpretations were not unreasonable and Sandobal and King had experience with drug trafficking investigations generally and with this investigation in particular, "'a reasonably well-trained [agent] could not be expected to know that the warrant issued' by the magistrate was invalid." *Cancelmo*, 64 F.3d at 809 (quoting *United States v. Buck*, 813 F.2d 588, 593 (2d Cir. 1987) (alterations in *Cancelmo*)). Therefore, Llanes's motion is DENIED.

## B. Guillen Orders

### 1. Relevant Facts

Guillen challenges two orders, the October 2016 Guillen Order and the August 2017 Guillen Order. The October 2016 Guillen Order sought historical cell site data for the period from August 1, 2016, to the date of the order for ten cellular phones. It was issued pursuant to § 2703 of the Stored Communications Act, which authorizes a court to issue an order for historical location information if "the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703. In issuing the order, Magistrate Judge Fox found that there were "reasonable grounds to believe that the historical cell site information and toll records [for the target phones] [were] relevant and material to an ongoing criminal

29

investigation." (Oct. 2016 Guillen Order 1.)

The August 2017 Guillen Order sought prospective and historical cell site location information and pen register information for two phones, the subscribers to which were unknown at the time. The order authorized the government to access historical cell site data for the period from July 15, 2017 through the date of the order, prospective location information for a period of forty-five days from the date of the order, and pen register information for a period of sixty days from the date of the order. Magistrate Judge Ellis reviewed and signed the order, finding there was probable cause that the prospective and historical location information would reveal evidence of crimes.

### 2. Discussion

Gabriel Guillen argues for suppression of the evidence obtained as a result of the October 2016 Guillen Order and the August 2017 Guillen Order on the grounds that (1) the applications for the orders relied on information from CS-1, and (2) the orders were issued on a showing of less than probable cause. Gabriel Guillen's arguments differ slightly from those of Llanes, in that he does not attack the facial sufficiency of the orders. Nonetheless, his arguments fail for the same reason, namely, the good-faith exception to the exclusionary rule applies.

First, assuming *arguendo* that Gabriel Guillen is correct that the information provided by CS-1 and relied upon in obtaining the orders was untrue, the good faith exception to the exclusionary rule applies, because both orders were issued by a detached and neutral magistrate judge. *See United States v. Clark*, 638 F.3d 89, 106 (2d Cir. 2011) ("'[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" (quoting *United States v. Leon*, 468 U.S. at 922 (alteration in *Leon*)). Guillen does not offer any argument with respect to why the good faith exception should not apply, and none occurs to the Court. Therefore, even if he is correct that CS-1's credibility

30

issues undermine the probable cause findings in the orders, evidence obtained as a result of the orders is not subject to suppression.

Gabriel Guillen's second argument is also defeated by the good faith exception to the exclusionary rule. In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court held that individuals have a reasonable expectation of privacy in cell-site data. Therefore, the acquisition of cell site location information from wireless providers requires "a warrant supported by probable cause." *Id.* at 2221. An order issued pursuant to the Stored Communications Act, in contrast, may be based on "only a showing of 'reasonable grounds' for believing that the records were 'relevant and material to an ongoing investigation,' [and therefore] falls short of this requirement." *United States v. Chambers*, No. 16-163-CR, 2018 WL 4523607, at *1 (2d Cir. Sept. 21, 2018) (summary order) (quoting *Carpenter*, 138 S. Ct. at 2220–21).

The October 2016 Order was issued based on the lower showing required by the Stored Communications Act—"reasonable grounds"—rather than on a showing of probable cause.[14]   In light of *Carpenter*, then, evidence acquired as a result of the order was obtained in violation of the Fourth Amendment.   The Government argues, however, that the good-faith exception to the exclusionary rule applies, and the Court agrees.

"[R]eliance on a federal statute gives rise to a presumption of good faith unless the statute is "clearly unconstitutional."' *Chambers*, 2018 WL 4523607, at *2) (quoting *Illinois v. Krull*, 480 U.S. 340, 349 (1987)). Prior to *Carpenter*, "the [Stored Communications Act] was not 'clearly unconstitutional.'" *Id.* (affirming a district court decision not to suppress evidence obtained as a result of an order issued prior to *Carpenter*).   Therefore, because the October 2016

---

[14] The August 2017 Order was based on a finding of probable cause; therefore, the Court need consider whether *Carpenter* requires suppression with respect to the October 2016 Order.

Order was issued in compliance with a federal statute which was not "clearly unconstitutional" at the time, it was reasonable for law enforcement officers to rely on the order, and the good-faith exception to the exclusionary rule applies. *See id.*

Accordingly, Gabriel Guillen's motions to suppress evidence obtained as a result of the October 2016 and August 2017 Guillen Orders are DENIED.

## VIII. Pretrial Disclosures

The Moving Defendants ask the Court to order the Government to provide (1) a bill of particulars; and (2) early disclosure of notice of prior crimes or bad acts that the Government will seek to introduce at trial pursuant to Fed. R. Evid. 404(b), sixty days in advance of trial. (Llanes Mem. 8–9, 13–14; Guillen Mem. 7–8.)

### A. Bill of Particulars

Llanes argues that the Government has not provided any information about his alleged criminal conduct, aside from generalized descriptions of the narcotics conspiracy, and therefore requests the Court to order the Government to produce a bill of particulars. He seeks specification of (1) when, where, and in what manner he is alleged to have become a member of the DTO, (2) how, where, and with whom he allegedly conspired, and (3) the approximate dates and times of his participation in the conspiracy. The Government contends that it has provided Llanes with substantial Rule 16 discovery and that he received information in the course of his bail applications and appeals; in addition, his alleged criminal activity is discussed in affidavits the government relied on in securing Title III wiretaps. (*See* Gov't Reply 8.)

The purpose a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also* Fed. R. Crim P. 7(f). Whether to order the Government to produce a bill of particulars is a decision

committed to the trial court's sound discretion. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). Moreover, courts in this district have routinely denied defendants' requests for particulars regarding the "when, where, and what" of their participation in a conspiracy. *See United States v. Columbo*, No. 04 CR. 273 (NRB) (Buchwald, J.), 2006 WL 2012511, at *5 (S.D.N.Y. July 18, 2006) (collecting cases).

The Superseding Indictment charges Llanes with conspiring to distribute narcotics from at least in or about August 2016 up to and including in or about August 2017, and includes the names of thirteen co-defendants also charged in the conspiracy. In addition to the information provided in the Superseding Indictment, Llanes has received substantial information about his role in the conspiracy via discovery and via information disclosed in the course of making bail applications to the court. *(See, e.g.*, Dec. 18, 2017 Order, ECF No. 94 (describing recorded conversations between Llanes and Vasquez); June 2017 Llanes Application (same). Taken together, this information provides Llanes with sufficient information to prepare for trial and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. Therefore, because he has not demonstrated the need for a bill of particulars, Llanes's motion is DENIED.

To the extent other defendants join Llanes's motion, those defendants' motions are DENIED because they have not set forth the reasons they are entitled to a bill of particulars. The arguments advanced by Llanes are unique to him; accordingly, they cannot justify compelling the Government to provide a bill of particulars for any of the other defendants.

**B.    Disclosure of 404(b) Evidence Sixty Days Prior to Trial**

Gabriel Guillen moves for the disclosure of 404(b) evidence sixty days prior to trial, on

33

the ground that the government has "hinted" at its intention to file a second superseding indictment charging Gabriel Guillen and other co-defendants with murder. (Gabriel Guillen Mem. 9.)

Rule 404(b) provides, in pertinent part, that "[e]vidence of a crime, wrong, or other act may . . . be admissible" for certain specified purposes. Under Rule 404(b), the Government must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." Gabriel Guillen has not made any argument as to why disclosure of Rule 404(b) evidence is required sixty days prior to trial, and does not explain why the possibility of a second superseding indictment supports early disclosure. Moreover, the Government has stated its intent to move in limine for the admission of Rule 404(b) evidence prior to trial. Because the Moving Defendants provide no basis on which to conclude that Rule 404(b)'s requirement of "reasonable notice" will not be satisfied moving forward, the motion for early disclosure is DENIED.

## CONCLUSION

For the foregoing reasons, all of the Moving Defendants' motions are DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 211, 212, 213, 216, 218, 235, 237, and 239.

SO ORDERED.

Dated: New York, New York
November 6, 2018

_Kimba M. Wood_

KIMBA M. WOOD
United States District Judge