UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

-against-

GABRIEL GUILLEN,

Defendant.

--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/31/20

17-CR-512 (KMW)
*FATICO* FINDINGS

KIMBA M. WOOD, United States District Judge:

Prior to sentencing in this matter, Defendant Gabriel Guillen ("Guillen") objected to

certain allegations in his Presentence Report ("PSR"). The Court held a *Fatico* hearing to

resolve Guillen's objections. *See United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), *cert.*

*denied*, 444 U.S. 1073 (1980). The following are the Court's findings of fact and conclusions of

law.

## BACKGROUND

### I. The Presentence Report

On May 10, 2019, Gabriel Guillen pleaded guilty, without the benefit of a plea

agreement, to conspiring to distribute and possess with intent to distribute, one kilogram and

more of heroin, five kilograms and more of cocaine, and 280 grams and more of cocaine base

("crack"), and associated substantive counts, in violation of 21 U.S. C. §§ 841(a)(1), (b)(1)(A),

and 846. (ECF No. 415.) The final PSR was filed on August 1, 2019. (ECF No. 493.)

The PSR calculated Guillen's base offense level by converting the quantities of cocaine,

heroin, and crack involved in the offense to their equivalent weights of marijuana ("converted

drug weight"). *See* U.S.S.G. § 2D1.1(a)(5). The PSR determined that Guillen's offense

involved 30 kilograms of cocaine, 25 kilograms of heroin, and 5 kilograms of crack. (ECF No.

493 ¶ 35.) Pursuant to the Drug Conversion Tables, these drug quantities equate to 48,855 kilograms of converted drug weight. *See* U.S.S.G. § 2D1.1(c). The PSR concluded, based on this calculation, that Guillen's offense involved more than 30,000 kilograms but less than 90,000 kilograms of converted drug weight, yielding a base offense level of 36. (ECF No. 493 ¶ 35.)

The PSR applied two enhancements to Guillen's base offense level. The PSR applied a two-level enhancement because it found that Guillen "maintained a premises for the purpose of manufacturing or distributing a controlled substance," pursuant to U.S.S.G. § 2D1.1(b)(12). (ECF No. 493 ¶ 36.) The PSR also applied four-level enhancement because it found that Guillen "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," pursuant to U.S.S.G. § 3B1.1(a). (ECF No. 493 ¶ 38.)

After adding these enhancements and subtracting three levels to credit Guillen for accepting responsibility for the offense and timely notifying the Government of his intention to plead guilty, the PSR arrived at a total offense level of 39. (*Id.* ¶ 42–44.)

## II. Guillen's Objections to the Presentence Report

On October 4, 2019, Guillen filed his sentencing submission. (ECF No. 549.) It states that he "objects to a number of inclusions in the Guideline calculation" in the PSR. (*Id.* at 2.) Guillen makes three specific objections.

First, Guillen denies he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," and thus the enhancement pursuant to U.S.S.G. § 3B1.1(a) should not apply.

Second, Guillen denies he "maintained a premises for the purpose of manufacturing or distributing a controlled substance," i.e., a "stash house," and thus the enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) should not apply.

Third, Guillen denies he conspired to distribute a converted drug weight of more than 30,000 kilograms, and thus his base level offense should not be 36. He claims that he should have been held responsible for only the drug weights to which he pled guilty, which totalled 2,999.88 kilograms of converted drug weight, yielding a base offense level of 32.

## III. The *Fatico* Hearing

On November 26, 2019 and December 4, 2019, the Court held a *Fatico* hearing to resolve these disputes. At the hearing, the Government called one witness, Rafael Rivera ("Rivera"). Following the hearing, the parties made written submissions on the disputed issues.[1]   (ECF Nos. 578, 583.)

## DISCUSSION

## I. Rivera's Testimony Is Credible.

Because Rivera was the only witness called at the *Fatico* hearing, the Court begins with an assessment of his credibility. The Court finds that Rivera's testimony is credible.

Rivera's demeanor at the hearing was calm. He took time to consider questions and testified carefully. He freely acknowledged when he did not recall information responsive to certain questions. His testimony is corroborated by evidence introduced at the *Fatico* hearing, such as the ledgers in which he recorded his drug deliveries. His testimony was also consistent with his testimony in the trial of Guillen's co-defendant, Joel Tapia ("Tapia").

In addition, Rivera had a strong incentive to tell the truth. Rivera's testimony—both at the *Fatico* hearing and at Tapia's trial—was given pursuant to a cooperation agreement. Lying at the *Fatico* hearing would risk his losing the benefit of his exhaustive testimony at Tapia's trial.

---

[1] Although Guillen's submission was a day late, the Court considers it because doing so will not prejudice the Government.

3

Guillen argues that Rivera cannot be trusted because of his criminal history and his admitted past lies to his probation officer. The Court recognizes Rivera's criminal history and admitted lies in the past to his probation officer but finds Rivera's testimony at the *Fatico* hearing credible notwithstanding those considerations.

## II. Guillen Maintained a Premises for the Purpose of Manufacturing or Distributing a Controlled Substance.

A defendant's offense level is increased by two levels "if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The Court finds that this enhancement applies to Guillen's offense.

Rivera testified he lived with Guillen and other individuals at an apartment called the "Vyse Apartment." (Nov. 26 Tr. at 6.[2]) Guillen and his subordinates used the Vyse Apartment to store, process, and package drugs. (*Id.* at 6, 24 –25.) Although the lease to the Vyse Apartment was in another individual's name, Guillen paid the rent, slept in the bedroom, and directed the drug-related activities in the apartment. (*Id.* at 24.)

Guillen responds that the Vyse Apartment was primarily his home, and thus "was not maintained primarily for the use [sic] as a drug factory." But conducting drug activities need not be the "sole purpose" of the premises for the enhancement to apply. Application Note 17, U.S.S.G. § 2D1.1. Instead, the enhancement applies if drug activities are "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.* This distinction depends on the frequency with which the premises is used for lawful versus illicit purposes. *Id.*

---

[2] Testimony from the November 26, 2019 session of the *Fatico* hearing is denoted "Nov. 26 Tr." Testimony from the December 4, 2019 session of the *Fatico* hearing is denoted "Dec. 4 Tr." Testimony from the trial in *United States v. Tapia*, No. 17-CR-512, is denoted "Trial Tr."

Given that Rivera testified that the Vyse Apartment was used to process and package drugs at least every other day, the Court finds that processing and packaging drugs was one of Guillen's principal uses for the premises. (Nov. 26 Tr. at. 25–26.) Thus, the two-point enhancement under § 2D1.1(b)(12) applies to Guillen's offense.

## III. Guillen Was the Leader of an Organization with More Than Five Participants.

A defendant's offense level is enhanced by four levels if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The Court finds that this enhancement applies to Guillen's offense.

Whether a defendant is a leader "depends upon the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States v. Beaulieau*, 959 F2d. 375, 379-80 (2d Cir. 1992). So long as the criminal activity included more than five persons, a defendant can be a "leader" even if he "leads" only one of its participants. *See United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003).

Guillen claims that Rivera did not work for him. Rivera, however, testified he "worked for" Guillen from April 2017 through August 2017, as part of Guillen's Drug Trafficking Organization ("Guillen's DTO"). (Nov. 26 Tr. at 5.) Rivera testified, *inter alia*, that Guillen recruited him, gave him drugs to deliver, instructed him to deliver the drugs, provided him with a car for delivering drugs, and managed the details of how and to whom he made those deliveries. (*Id.* at 17–20.) Rivera testified, "Gabriel [Guillen] was the boss. I received orders from him to whom I could deliver, to whom I could not deliver, who was going to give me money, who was not going to give me money." (Dec. 4. Tr. at 22.) Given Rivera's voluminous, detailed

testimony about how Guillen managed Rivera's receipt of drugs and Rivera's drug deliveries, the Court finds that Rivera worked for Guillen's DTO.

Rivera testified that he observed at least five other individuals working for Guillen: (1) Wilson Guillen, who cooked crack; (2) Zoraida, who counted money and packaged drugs; (3) Kike[3], who delivered drugs; (4) Moises, who packaged drugs; and (5) Los, who delivered drugs and collected money from drug customers. (Nov. 26 Tr. at 21–23; Dec. 4 Tr. at 23.) Rivera stated that Guillen "gave instructions to everyone" concerning narcotics activities. (Dec. 4 Tr. at 23.)

Guillen denies that these individuals worked for him in the narcotics trade. His arguments are not persuasive.

Guillen argues that Kike had his own customers, and thus that he did not work for Guillen in the narcotics trade. (Trial Tr. at 298.) In fact, Rivera testified at Tapia's trial that "Kik[e] was one of Gabriel[ Guillen]'s workers," and that Guillen became angry with Kike when Kike tried to obtain some of his own customers. (Trial Tr. at 246–47.) In any event, even if Kike had his own customers, that is not inconsistent with his working for Guillen.

Guillen argues that Zoraida was his girlfriend, and that she did not work for him. Rivera testified that Zoraida, in addition to being romantically involved with Guillen, counted narcotics proceeds and packaged narcotics on Guillen's instructions. (Nov. 26 Tr. at 21; Dec. 4 Tr. at 38.)

Guillen argues that Los received deliveries of drugs from Rivera, and thus that Los did not work for Guillen. (Trial Tr. at 158.) At Tapia's trial, Rivera testified that, when he was

---

[3] This individual's name is spelled "Kiki" in the transcript of Joel Tapia's trial and "Quinquin" in the *Fatico* hearing transcript. According to the Government's *Fatico* submission, his name is spelled "Kike."

delivering the Guillen DTO's drugs to Guillen's customers, Los was one of the individuals to whom he made deliveries. Los' purchasing narcotics from a worker in Guillen's DTO does not exclude the possibility that he was part of Guillen's DTO.

Guillen argues that Miguel, who held the lease on the Vyse Apartment, was not involved in the drug enterprise. The Government does not claim Miguel worked for Guillen.

Guillen does not attempt to challenge the Government's claims that Wilson Guillen and Moises were Guillen's subordinates in Guillen's DTO.

Guillen also argues that he was a "middleman," rather than a leader. Guillen cites testimony from Tapia's trial that he was supplied with narcotics by individuals named Adolfo, Edward Jimenez, and Johnnie. (Trial Tr. at 304–05.) Even if Guillen were a middleman, that does not preclude his being a leader of his own workers.

Rivera's testimony establishes, by a preponderance of the evidence, that Guillen was a leader of a criminal organization involving at least six persons: Rivera, Wilson Guillen, Zoraida, Kike, Moises, and Los.

## IV. The Appropriate Base Offense Level is 36.

The base offense level for a violation of 21 U.S.C. § 841(a)(1) depends upon the quantity of drugs involved in the offense. *See* U.S.S.G. § 2D1.1(a)(5), (c). The Government claims Rivera's testimony establishes that Guillen conspired to distribute at least 30,000 kilograms of converted drug weight, yielding an offense level of 36. *See id.* § 2D1.1(c)(2). The Government supports its position with citations to the following of Rivera's testimony:

• Cocaine: Rivera testified that, several times, he observed, or was told by Guillen, that Guillen obtained cocaine for distribution, which Guillen usually obtained from his cocaine supplier, Edward. (Nov. 26 Tr. at 30, 36–40.) In total, Guillen obtained at least 53 kilograms of cocaine, or 10,600 kilograms of converted drug weight.

• Heroin: Rivera testified that, several times, he observed, or was told by Guillen, that Guillen received heroin for distribution. (*Id.* at 41–43.) In total, Rivera testified that Guillen received at least 25 kilograms of heroin, or 25,000 kilograms of converted drug weight.

• Crack: Rivera testified based on his own contemporaneous written records of his crack deliveries on behalf of Guillen's DTO, which show that he delivered 1,684 grams of crack, or 6,013 kilograms of converted drug weight. (Dec. 4 Tr. at 3, 5–17.)

In total, Rivera testified that Guillen conspired to distribute 41,613 kilograms of converted drug weight, placing him well over the 30,000-kilogram threshold for offense level 36.

Guillen responds by noting a discrepancy between Rivera's testimony at Tapia's trial, and his testimony at the *Fatico* hearing. In both proceedings, Rivera testified that in an early meeting with Guillen, he saw a video of drugs being packaged. At trial, Rivera said the drug was cocaine; at the *Fatico* hearing, he said it was heroin. (Trial Tr. at 132–33; Nov. 26 Tr. at 13.) Guillen implies that Rivera's ability to identify drugs is suspect. The Court credits Rivera's testimony that he was mistaken at the *Fatico* hearing, but that, as an experienced dealer of crack, cocaine, and heroin, he can tell the difference between heroin and cocaine. (Dec. 4 Tr. at 37–38.) Moreover, Rivera testified that Guillen repeatedly told him the type of drugs Guillen was receiving, and what type of drug he, Rivera, was to deliver.

Next, Guillen argues Rivera's testimony was based on "assumptions," because Rivera often testified he was "told about" certain drug weights. But Rivera consistently testified that he either observed Guillen's receipt of a quantity of drugs, or that Guillen himself told Rivera that Guillen was receiving a particular quantity of drugs, or both. Rivera's detailed, specific, and credible testimony convinces the undersigned that he was testifying from reliable personal memory, rather than mere "assumptions."

8

Next, Guillen argues Rivera may have double-counted deliveries of cocaine, which were later cooked into crack-cocaine. Guillen does not explain how much of the drug weight of crack was, in his view, subject to double-counting. Even if this argument were correct, it would not change the Court's conclusion, because the heroin and cocaine alone add up to over 30,000 kilograms of converted drug weight, without counting any of the crack.

The Court concludes that Rivera's testimony credibly establishes that Guillen's offense involved at least 30,000 kilograms of converted drug weight, yielding a base offense level of 36.

## CONCLUSION

Based on the testimony given at the *Fatico* hearing, the Court adopts the PSR's application of a two-level enhancement to Guillen's offense level, pursuant to U.S.S.G. § 2D1.1(b)(12); its application of a four-level enhancement to Guillen's offense level, pursuant to U.S.S.G. § 3B1.1(a); and its calculation of Guillen's base offense level as 36.

SO ORDERED.

Dated: New York, New York
January 20, 2020

_Kimba m. Wood_

KIMBA M. WOOD
United States District Judge

9